# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-1381
_____

ROBERT A. KOROLY,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Escambia County.
Thomas V. Dannheisser, Judge.

August 16, 2018


ROWE, J.


After consuming fourteen beers, Robert Koroly drove the wrong way on Interstate 110 colliding head-on with a vehicle driven by Johnny Robinson. Within seconds, a third vehicle driven by Clarence Jordan struck Robinson's vehicle. The crash left Jordan with serious injuries, and Robinson died as a result of the injuries he sustained in the crash.

Koroly was charged with DUI manslaughter and DUI with serious bodily injury. Koroly elected not to go to trial and entered a plea. He was sentenced to 13.25 years' imprisonment followed by 6.75 years' probation.

After serving four years of his sentence, Koroly sought to withdraw his plea on grounds that his counsel was ineffective for failing to retain an accident reconstruction expert to evaluate the road conditions that existed at the time of the crash. Koroly argued that had his counsel retained an expert, the expert would have discovered defective signage on the interstate and hazardous weather conditions, both of which could have contributed to the crash. Under those circumstances, Koroly asserts that he would not have entered a plea. The trial court denied Koroly's motion, concluding that counsel's performance was not deficient. We agree and affirm.

*I. Facts*

Koroly was a commissioned officer in the United States Navy. He had served nearly eight years as a naval aviator, with the last few years of his military career as a flight instructor stationed at the Naval Air Station in Pensacola, Florida. The record is replete with references to Koroly's achievements and honorable service to his country. Numerous letters offered at sentencing by Koroly's family, friends, and colleagues recount Koroly's past accomplishments and future potential.

a. The crash

On April 30, 2010, Koroly celebrated one aspect of that future. He planned to move in with his soon-to-be fiancé and her children. Koroly and his friends visited multiple bars that evening in downtown Pensacola. The celebration lasted into the early morning hours of May 1, 2010.

Sometime before 5:42 a.m., the celebration ended. It is unknown what time Koroly left downtown Pensacola or why he got behind the wheel of his SUV. There is no evidence of where he was headed or how he came to be driving the wrong way on the interstate. What is known is this: with a blood alcohol level of over twice the legal limit, Koroly entered a southbound exit ramp on Interstate 110 and drove at least 1,700 feet in the wrong direction before colliding head-on with 54-year-old Johnny Robinson. Robinson, a single father of four, was traveling home from work to his home in Navarre, Florida. Robinson and Koroly's

2

vehicles spun out of control before coming to a stop in the center lane of the highway. Within seconds, 25-year-old Clarence Jordan struck the right side of Robinson's vehicle.

The force of the impact trapped Koroly inside his SUV. When officers arrived, Robinson was unconscious. Jordan was found lying on the ground next to his driver's side door. He had attempted to exit his car and help Robinson and Koroly, but he fell due to his right hip being dislocated in the crash.

An eyewitness told officers that Koroly's vehicle came out of nowhere and had been traveling in the wrong direction. The witness, who had pulled over to help the victims, observed that Koroly was "out of it." In the ambulance, two emergency responders overheard Koroly admit to drinking fourteen beers. The officers noticed Koroly's eyes were bloodshot and his speech was slurred.

Koroly initially denied being the driver of the SUV. After the officers asked him if he was a member of the military, Koroly changed his story and admitted that he had been driving and could not remember what happened. He cooperated with law enforcement in their investigation by consenting to a blood draw at the hospital. The tests revealed Koroly's blood alcohol content was .166.

Johnny Robinson was pronounced dead at Baptist Hospital from the injuries he sustained in the crash. Clarence Jordan suffered from a broken hand, four broken fingers, a gash on his right leg, and a dislocated hip. He required eight days of hospitalization and underwent hip surgery, followed by extensive physical therapy. Koroly was charged with DUI manslaughter for the death of Robinson. He was charged with DUI with serious bodily injury for causing Jordan's injuries.

### b. Retaining counsel

Koroly's parents retained defense attorney Clinton Couch to defend Koroly. The Korolys were intimately involved with the case. Residents of Philadelphia, Mr. and Mrs. Koroly flew to Florida at least four times during a nine-month period to meet with

3

Couch about Koroly's defense. They often prepared written questions for Couch. They wanted to understand the gravity of the charges and what sentence Koroly could be facing.

Early in Couch's representation of Koroly, the Korolys discussed with Couch the possibility of retaining an accident reconstruction expert. According to Mr. Koroly, the Korolys had family friends who were defense attorneys in Philadelphia; those friends stressed to the Korolys that obtaining an accident reconstruction report should be their top priority. Such a report could help explain the cause of the crash. The Korolys conveyed this information to Couch. They asked him to research whether there had been a history of traffic problems near and around the crash site. They also sought information on the road signage, hoping to uncover an alternative cause of the crash unrelated to Koroly's intoxication. During every conversation, whether in person or via telephone, the Korolys asked Couch about the reconstruction expert and whether one could be retained. Money was not an issue. Couch's response was always that he would look into the road signage issues, but the accident reconstruction expert would have to wait until there was a plea offer or trial.

At some point, Couch did contact an accident reconstruction expert, Christopher Bloomberg. According to Couch, he sent Bloomberg a copy of the traffic homicide report and photographs of the scene of the crash. He asked Bloomberg to conduct a "preliminary evaluation" to see if there was anything in the documents that raised "any red flags." Bloomberg, according to Couch, reviewed the documents and determined there was nothing that would justify a more comprehensive accident reconstruction.

Following this communication, Couch did not retain Bloomberg, or any other expert to perform a more comprehensive accident reconstruction. He never told the Korolys that he consulted with Bloomberg; instead, he told them that an accident reconstruction report would not help Koroly's case and suggested Koroly enter a plea.

## c. Plea and sentencing

On advice from Couch, Koroly entered a straight-up plea. At sentencing, Koroly and his family offered emotional apologies to the Robinson family and to Clarence Jordan. Koroly accepted full responsibility for "his negligent behavior" and anticipated a period of imprisonment. Koroly admitted that he was solely responsible and that he would never forgive himself for his poor judgment on the morning of the crash. He revealed that he had successfully completed a twelve-step program with a promise to never consume alcohol again. Koroly vowed to turn the Robinson family's tragedy into a life-long mission by joining the movement against drinking and driving. He wanted to help other members of the military who may be unknowingly suffering from alcoholism. After completion of his sentence, Koroly planned to start a military program to reinforce the dangers of drunk driving.

On March 24, 2011, the court sentenced Koroly to the minimum sentence allowable under the Criminal Punishment Code. For DUI manslaughter, a second-degree felony punishable by up to 15 years' imprisonment, Koroly was sentenced to 13.25 years' imprisonment followed by 1.75 years' probation. For DUI with serious bodily injury, a third-degree felony punishable by up to 5 years' imprisonment, Koroly was sentenced to 5 years' probation.

## d. Postconviction motion

After serving two years of his sentence, Koroly retained mechanical engineer Donald Fournier to conduct a comprehensive accident reconstruction analysis of the crash. Fournier examined the traffic homicide report and the crash scene photos. He also visited the scene of the accident and attempted to identify Koroly's travel pattern. Fournier uncovered four plausible routes Koroly could have driven from downtown Pensacola to a southbound Interstate 110 exit ramp. He concluded that the roads were deficiently signed, marked, and painted, and that the weather conditions on the morning of the crash were foggy and dark. It was his opinion that as configured, the roadway geometry and signage would actively mislead a driver unfamiliar with the area to enter

the southbound exit and that any driver could have found themselves going the wrong way on southbound Interstate 110.

Based on Fournier's findings, Koroly filed a postconviction motion alleging Couch was ineffective for failing to retain an accident reconstruction expert. Had Couch retained an expert, Koroly argued, the deficiencies in the road signage would have been discovered and Koroly would have elected to go to trial.

At the evidentiary hearing on the motion, Couch, Fournier, and Bloomberg testified. Board certified criminal defense attorney Michael Kessler and Koroly's father, Robert Koroly, Sr., also testified. Fournier estimated the distance Koroly drove the wrong way on Interstate 110 was between 1,700 feet (the length of at least five football fields) and two miles. Fournier admitted that he had not taken into account Koroly's blood alcohol level of .166.

Bloomberg, the expert who had been contacted by Couch, recalled speaking to Couch on the phone but could not remember the specific content of their conversation. Bloomberg testified that Couch hired him to "essentially evaluate some materials that were sent in." He performed a preliminary review in order to determine what else would be needed to complete a more comprehensive evaluation and analysis. Following their initial contact, Couch never directed Bloomberg to do anything additional with Koroly's file, and Bloomberg never heard from Couch again. In preparation for his testimony at the postconviction hearing, Bloomberg reviewed Fournier's report. Bloomberg testified that he would have been able to produce a similar reconstruction analysis. But on cross-examination, Bloomberg acknowledged that Koroly's blood alcohol level would have been an issue.

Couch's testimony at the hearing contradicted Bloomberg's testimony in some respects. Couch stated that he retained Bloomberg to conduct a preliminary investigation to see if there were any anomalies in the traffic homicide report and photographs that would justify a more comprehensive accident reconstruction. He recalled that after Bloomberg's review of the documents, Bloomberg gave him the impression that there was nothing in the records that would warrant a more comprehensive reconstruction. Relying on Bloomberg's opinion, Couch went to the Korolys and

6

told them that an accident investigation would not improve Koroly's circumstances. Couch added that if he had ignored Bloomberg's preliminary opinion and retained an expert for a more comprehensive accident reconstruction, he would not have been acting as a good steward of Koroly's funds and could have risked creating a compelling expert witness for the State.

The trial court denied Koroly's motion for postconviction relief, finding Couch's performance was not deficient. The court determined that Couch had retained Bloomberg for the purpose of conducting a preliminary investigation and then made a strategic decision not to go forward with a more comprehensive accident reconstruction after Bloomberg's initial review. In so finding, the court also noted that "[n]o expert witness could alter the fact" that Koroly's operation of a motor vehicle while under the influence caused or contributed to the accident. This appeal followed.

## II. Analysis

A claim of ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prove ineffective assistance, an appellant must allege: 1) the specific acts or omissions of counsel which fell below a standard of reasonableness under prevailing professional norms, *see id.* at 690; and 2) that the appellant's case was prejudiced by these acts or omissions such that the outcome of the case would have been different, *see id.* at 692. The appellant must make a sufficient showing of both deficient performance and prejudice in order to obtain postconviction relief. *See id.* at 697; *Valle v. Moore*, 837 So. 2d 905, 910-11 (Fla. 2002). To prove the first prong, the appellant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *Johnston v. State*, 70 So. 3d 472, 477 (Fla. 2011). "A reviewing court must then, in light of all the circumstances, determine whether the identified acts or omissions were outside the wide range of professionally competent assistance." *Johnston*, 70 So. 3d at 477 (internal quotations omitted). The prejudice prong requires that the appellant demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. "A reasonable probability is a

7

probability sufficient to undermine confidence in the outcome." *Id*. Thus, the appellant must demonstrate a likelihood of a different result which is substantial and not just conceivable. *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

## a. Deficient Performance

In evaluating whether an attorney's conduct is deficient, counsel's errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *see also Bradley v. State*, 33 So. 3d 664, 671 (Fla. 2010). The defendant "bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Brown v. State*, 755 So. 2d 616, 628 (Fla. 2000) (citing *Strickland*, 466 U.S. at 688-89); *Long v. State*, 118 So. 3d 798, 803 (Fla. 2013); *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). Courts perform a "context-dependent consideration" and analysis of counsel's conduct to determine whether counsel's decisions were "reasonable" under the circumstances at the time of the alleged deficient performance. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688-89); *Williams v. Taylor*, 529 U.S. 362, 391 (2000) (noting the *Strickland* test "of necessity requires a case-by-case examination of the evidence").

Koroly asserts that Couch's decision not to retain an expert to conduct a more comprehensive accident reconstruction was unreasonable under prevailing professional norms, focusing on two reasons Couch provided for his decision. Koroly asserts that Couch's desire to be a good steward of Koroly's funds and to avoid creating an expert witness for the State could not be considered reasonable strategy. However, Koroly fails to address Couch's primary, most significant reason for deciding against obtaining an expert report: His reliance on Bloomberg's preliminary, expert opinion that the circumstances of Koroly's crash did not warrant a more comprehensive accident reconstruction analysis. Couch had no reason to disbelieve or challenge Bloomberg's expert opinion. While Couch and Bloomberg recounted different versions of their telephone conversation, the trial court found Couch's testimony more credible. *Wait v. State*, 212 So. 3d 1082, 1085 (Fla. 1st DCA

2017) ("This Court will not substitute its judgment for that of the trial court on questions of fact, the credibility of the witnesses, and the weight given to the evidence."). After examining the damaging evidence against Koroly, including Koroly's admission and blood alcohol level as well as the circumstances surrounding a plea compared to a loss at trial, Couch decided against requesting that Bloomberg provide a more comprehensive accident reconstruction report. While he could have requested such a report, we find Couch's decision not to was reasonable given the circumstances. *See Wiggins*, 539 U.S. at 523; *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; . . . counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Accordingly, the trial court correctly determined that Koroly did not meet his burden of proving Couch's performance was deficient. *See Nelson v. State*, 43 So. 3d 20, 28 (Fla. 2010) ("[T]he defendant carries the burden to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.").

b. Prejudice

In addition to failing to establish deficient performance, Koroly also failed to demonstrate prejudice. In *Hill v. Lockhart*, 474 U.S. 52, 58 (1985), the Supreme Court applied the *Strickland* test to claims of ineffective assistance of counsel in the context of a defendant pleading guilty to a crime. The Court modified the *Strickland* prejudice requirement, stating that in plea cases the issue is "whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59; *see also Brazeail v. State*, 821 So. 2d 364, 368 (Fla. 1st DCA 2002).

Importantly, "[t]he prejudice component of a *Hill* claim involves a legal standard and is not a purely factual determination." *Capalbo v. State*, 73 So. 3d 838, 841 (Fla. 4th DCA 2011). "Courts should not upset a plea solely because of *post hoc*

9

assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Jae Lee v. United States*, 137 S.Ct. 1958, 1967 (2017). Rather, in determining whether a defendant was prejudiced, we must objectively consider the totality of the circumstances at the time of the plea:

> [I]n determining whether a reasonable probability exists that the defendant would have insisted on going to trial, a court should consider the totality of the circumstances surrounding the plea, including such factors as *whether a particular defense was likely to succeed at trial*, the colloquy between the defendant and the trial court at the time of the plea, and the difference between the sentence imposed under the plea and the maximum possible sentence the defendant faced at a trial.

*Grosvenor v. State*, 874 So. 2d 1176, 1181-82 (Fla. 2004) (emphasis added).

Here, Koroly testified that if Couch had provided him with the information from an accident reconstruction expert like Fournier, there was "no question" he would have elected to go to trial. Couch seemingly agreed:

> Whether or not it would have changed my client's opinion, I think it probably would have, to tell you the truth, because of his complete lack of any kind of history of this type of thing, his complete standing as an officer in the Navy and making sound decisions in combat. I know that this was bewildering to him: How in the world could I have possibly found myself in this position?

> So it may have changed his mind. He may have decided this is why I was there is because of inadequate signage, and I made a mistake that anybody could have made. So he may have said, I understand what you are saying, Clint, but I want to take this to trial. I can't say today that he would have wanted – you know, entered a plea or taken the case to trial.

10

However, under *Lee*, we cannot upset Koroly's plea based solely on his post hoc assertions that he would have elected to go to trial had he obtained an expert report. *Lee*, 137 S.Ct. at 1967. Instead, we must apply the *Grosvenor* factors and consider the totality of the circumstances surrounding his plea. In doing so, we find that the contemporaneous evidence from the time of Koroly's plea does not substantiate his post hoc preference for trial. First, Koroly received a dramatically lower prison sentence than what he would have been subjected to had he elected to go to trial. Charged with second- and third-degree felonies, Koroly was facing up to twenty years' imprisonment with a four-year mandatory minimum. But as a result of the plea, Koroly received the lowest permissible sentence under the Criminal Punishment Code—13.25 years' imprisonment. Second, Koroly signed an agreement acknowledging the consequences of entering a plea, and the sentencing court conducted a sufficient plea colloquy to ensure Koroly understood those rights he was forfeiting, including the right to trial and the right to present any and all defenses.

As to the final factor, any defense Koroly could have raised by virtue of obtaining a more comprehensive accident reconstruction had little to no likelihood of succeeding at trial. Despite the clear language in *Grosvenor*, Koroly asserts that the success of any potential defense is not a relevant consideration in determining whether Couch's deficient performance prejudiced him. However, the United States Supreme Court recently clarified that where a defendant's decision about going to trial turns on his prospects of success, and the attorney's alleged error affected those prospects of success, "the defendant must also show that he would have been better off going to trial." *Lee,* 137 S.Ct. at 1966. The Court explained that the prejudice inquiry "demands a case-by-case examination of the totality of the evidence" and focuses on a defendant's decision-making:

> A defendant without any viable defense will be highly likely to lose at trial. And a defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial. But that is not because the prejudice inquiry in this context looks to the probability

11

of a conviction for its own sake. It is instead because defendants obviously weigh their prospects at trial in deciding whether to accept a plea. Where a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one.

*Id.* (internal citations omitted).

Had Koroly obtained a more comprehensive accident reconstruction, he argues he would have advanced a defense at trial that it was not his intoxicated driving that caused the crash, but rather the defective road signs and poor weather conditions that caused him to drive the wrong way onto the interstate. But evidence of poor road conditions and inadequate signage would have had very little probative value in light of the overwhelming evidence of Koroly's intoxication and the extremely low threshold for proving causation under the DUI manslaughter statute. *See* § 316.193, Fla. Stat. (2011). Under the plain language of the statute, the State was not required to prove that Koroly's intoxicated driving was the *sole* cause of the fatal crash. As we recently explained in *Pryear v. State*, 43 Fla. L. Weekly D491 (Fla. 1st DCA Feb. 28, 2018):

> DUI manslaughter requires proof that a defendant operated a vehicle while impaired within the meaning of section 316.193(1), Florida Statutes (2013), and, "by reason of such operation, cause[d] or *contribute[d]* to causing . . . [t]he death of any human being . . . ." § 316.193(3)(c)3.a., Fla. Stat. (2013) (emphasis added). "[T]he fact that someone is intoxicated and drives a particular vehicle which causes another person's death should be enough to satisfy the elements of DUI manslaughter." *State v. Hubbard*, 751 So. 2d 552, 563 (Fla. 1999). "The causation element of the amended statute was interpreted by [the Florida Supreme Court] in [*Magaw v. State*, 537 So. 2d 564, 567 (Fla. 1989),] as not requiring that the conduct of the operator of the vehicle be the *sole* cause." *Hubbard*, 751 So. 2d at 564 (emphasis in original). "The statute requires only that the operation of the vehicle should have caused the

12

> accident. Therefore, any deviation or lack of care on the part of a driver under the influence to which the fatal accident can be attributed will suffice." *Magaw*, 537 So. 2d at 567.

*Id.* at *5.[1]

That Koroly's intoxicated driving contributed to the death of Robinson and Jordan's injuries was indisputable. Koroly's blood alcohol level was over twice the legal limit. Two emergency responders overheard Koroly say that he had consumed fourteen beers. The officers responding to the scene noticed Koroly's eyes were bloodshot and his speech was slurred. Although Koroly's point of entry is unknown, the expert testimony examined several possible routes, the closest of which placed the scene of the crash at least 1,700 feet away from the nearest entry point. Even if inadequate signage and poor road conditions led Koroly the wrong way, had Koroly not been intoxicated he likely would have noticed the interstate median on his right and the headlights of any oncoming vehicles and corrected his actions before traveling the length of over five football fields and colliding head-on with Johnny Robinson. *See Hubbard*, 751 So. 2d at 563 (citing *Ingram v. Pettit*, 340 So. 2d 922, 924-25 (Fla. 1976) ("Intuitively, someone who is intoxicated will not be able to control his or her automobile in a safe manner and make quick decisions and execute maneuvers that will avoid accidents.")). No expert testimony could have refuted the fact that Koroly's driving under the influence contributed to the cause of Robinson's death and Jordan's injuries. Koroly's purported defense had virtually no possibility of succeeding at trial. *See Hill*, 474 U.S. at 59 ("[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the

---

[1] In *Pryear*, we noted that the current version of the DUI manslaughter statute contains an even lower threshold for establishing causation than the version of the statute interpreted in *Magaw* and *Hubbard*. *Id.* The previous version of the statute required that operating a vehicle while intoxicated "cause" a death, whereas the current version requires operating a vehicle while intoxicated "cause or *contribute to*" the victim's death. *See* § 316.193(3)(c)3., Fla. Stat. (2013) (emphasis added).

'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial."); *Grosvenor*, 874 So. 2d at 1181 ("The merits of any defense . . . is relevant to the credibility of the defendant's assertion that he would have insisted on going to trial. If the defense was meritless, the defendant's claim carries much less weight.").

Viewing the totality of the circumstances as required by *Grosvenor*, and applying the Court's clarification of the standard in *Lee*, we find that Koroly has not established that but for Couch's failure to obtain a more comprehensive accident reconstruction report, he would have elected to go to trial. Koroly acknowledged the consequences of his plea and received a far better sentence than would be likely after trial. Considering the minimum threshold for proving causation for the offenses of DUI manslaughter and DUI with serious bodily injury, Koroly did not meet his burden of proving that his defense of defective road signage would have succeeded at trial in light of the overwhelming evidence of his intoxication. Because Koroly failed to establish either deficient performance or prejudice, we affirm the trial court's denial of postconviction relief.

M.K. THOMAS concurs; B.L. THOMAS, C.J., concurs in result only.

————————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

————————————————


Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Samuel B. Steinberg, Assistant Attorney General, Tallahassee, for Appellee.